LARRY BURD, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*
(Jerry DeBolt Mason Contractors, Appellee).

Third District (Industrial Commission Division)   No. 3—89—0529WC

Opinion filed January 17, 1991.

BARRY, P.J., concurring in part and dissenting in part.

Floyd C. Dailey, of Harvey & Stuckel, Chartered, of Peoria, for appellant.

Pamela K. Harman, of Cohn, Lambert, Ryan, Schneider & Harman, Ltd., of Chicago, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Larry Burd, appeals from an order of the circuit court of Peoria County confirming the decision of the Illinois Industrial Commission (Commission) denying claimant fees for services rendered by his fiancee and denying him attorney fees for delay and unfairness in the payment of benefits to claimant.

On July 11, 1986, claimant was injured in a work-related accident which rendered him a paraplegic. At the time of his accident, claimant

lived with his fiancee, Emily Purtscher (Emily), in a two-bedroom house claimant had purchased a year or so before and to which he was planning to make improvements. The value of the house in 1987 was $6,000. At the arbitrator's hearing, which was held pursuant to section 19(b—1) of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 138.19(b—1)), the following pertinent evidence was presented.

Dr. Thomas E. Szymke, who practices exclusively in the field of physical medicine and rehabilitation, testified that he became claimant's primary care physician following claimant's surgery until claimant's discharge from the hospital on October 8, 1986. Dr. Szymke was an employee of the Institute of Physical Medicine. He directed an occupational therapist to evaluate claimant's house. As a result of the evaluation, Dr. Szymke prescribed nine modifications which would be necessary in order for claimant to live independently in his house. Later, two additional modifications were added to the list. Prior to claimant's discharge from the hospital, the only modification made was the installation of a hand-held shower hose. An October 10, 1986, progress report from Barbara Senn, a nurse at the institute in charge of communications with State Farm, the insurance carrier, indicated that State Farm authorized a rental wheelchair, bathroom equipment, and a portable ramp.

According to Dr. Szymke, with the modifications to the house he prescribed, claimant could live independently with no need for nursing care or help in entering or exiting the house.

Dr. Szymke was then questioned by claimant's attorney as follows:

"Q. In viewing the home and modifications, did you reach an opinion as to whether that house is modifiable on a permanent basis or a temporary basis?

A. I think some common sense would have to enter into this whole discussion. I mean, after—*** it would certainly seem more optimal, most optimal, to have a domicile that could be modified that would add to the value of the home so that if it was sold it would be in such an environment and neighborhood that the money, the equity would then be applied to another domicile so one would want to pick a nice home in a good neighborhood, low end house that would have the modifications and bring it up to the other high quality homes in the neighborhood so it's not thousands of dollars above but it would be at that level. And it would take a lot of looking, but they're out there. It's not an impossible thing."

Dr. Szymke also acknowledged that he had not visited claimant's house

and that he was aware of a report dated September 22, 1986, in which one of his therapists expressed concern about making repairs and modifications to the home in relation to its value.

Dr. Szymke was also of the opinion that claimant could not exist in his house without assistance provided by either a home care service or a "significant other." He defined "significant other" as either a "girlfriend" or a "wife," or a "fiancee, it's whoever that person is in your life who's significant." Dr. Szymke explained that the duties of the "significant other" in claimant's case would include assisting the claimant out of the house in case of an emergency, assisting with baths and showers, or anything else that was necessary due to the fact that the modifications he had prescribed had not been made to the residence. He also related that while claimant had been receiving assistance from Quality Care, those services were being terminated as of the date of the arbitrator's hearing. In light of that, Dr. Szymke recounted as follows:

"[Claimant] needs to be in an accessible environment, and without the accessible environment either a significant other or friend or relative or somebody is going to have to be there or he is in danger."

Emily Purtscher, claimant's fiancee, testified as follows. She has known claimant for four years. She and her four-year-old daughter, Chris, moved in with claimant in October 1985. In December 1985, claimant and she became engaged to be married. She is presently employed by her father at Purtscher Cement. Since the claimant returned home from the hospital in October 1986, she has spent a total of 3,012 hours with him. Those figures exclude the time she is employed, when the Quality Care person is there, trips to Chicago that claimant made, and his physical therapy.

According to Emily, she has to assist claimant to exit and enter the house because he cannot manage the portable ramps by himself. She also assists him with bathing. She does the laundry, the cooking, and takes out the garbage. She also assists claimant in putting his socks and shoes on when his legs become swollen, about three or four times per week. Claimant washes the dishes and puts the laundry away, although he cannot put Chris' clothes away because the hallway is too narrow. Emily also puts the clean dishes away because claimant cannot reach the cabinets. Although he cannot run the sweeper, he has the house cleaned by the time she returns home. Before they had Quality Care Services, she would call every 10 to 15 minutes to make sure claimant was all right, or she would return home during the day for a short visit.

Michael Bynum, a workers' compensation supervisor for State Farm Insurance Company, testified that it was the opinion of the insurance carrier that the Act (section 8(a)) did not provide for home modifications.

Following the hearing, the arbitrator made the following findings pertinent to our review of this case in her decision of March 11, 1987. The arbitrator found that home care service was reasonable and necessary and ordered the employer to pay the bill for Quality Care. However, she further found that Emily was not entitled to payment for the hours spent caring for the claimant, since she had occupied the same residence as the claimant prior to the injury and had continued to work full time after his injury. The arbitrator also found that penalties for nonpayment of medical bills or necessary maintenance were not appropriate *"at this time."*

On review of the arbitrator's decision, the Commission found in its decision of August 1, 1987, that the evidence that claimant required either home modifications or 24-hour-per-day care was unrebutted and that Emily was not obligated to provide the home care. The Commission, *inter alia,* awarded $21,924 for the services of Emily. The Commission further found that State Farm had been guilty of delay and unfairness in the payment of benefits due claimant and awarded claimant attorney fees in the amount of $366.13 (20% of $1,830.63 in unpaid bills of Quality Care).

On review by the circuit court of Peoria County, the court in its order of February 11, 1988, found the award for the services of Emily and the award of attorney fees to be against the manifest weight of the evidence and remanded the case to the Commission with instructions to affirm the arbitrator's decision with respect to those two issues.

On remand from the circuit court, the Commission on September 2, 1988, affirmed the March 11, 1987, order of the arbitrator *in toto.* The circuit court affirmed the decision of the Commission, and this appeal followed.

Claimant contends, first, that the September 2, 1987, decision of the Commission denying claimant $21,924 for the services of Emily was against the manifest weight of the evidence. Since that decision resulted from the reversal by the circuit court of the Commission's August 1, 1987, decision which did compensate claimant for Emily's services, the real issue to be addressed here is whether the August 1, 1987, decision of the Commission was against the manifest weight of the evidence.

Section 8(a) of the Act provides in pertinent part as follows:

"The employer shall provide and pay for all necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury. The employer shall also pay for treatment, instruction and training necessary for physical, mental and vocational rehabilitation of the employee, including all maintenance costs and expenses incidental thereto. If as a result of the injury the employee is unable to be self-sufficient the employer shall further pay for such maintenance or institutional care as shall be required." Ill. Rev. Stat. 1987, ch. 48, par. 138.8(a).

We begin our discussion by noting the lack of appellate cases in Illinois dealing with this issue. However, other jurisdictions have awarded compensation for home care services rendered by a nonrelative. See, *Currier v. Roman L. Hruska U.S. Meat Animal Research Center* (1988), 228 Neb. 38, 421 N.W.2d 25.

The cases do, however, distinguish between nursing services and housekeeping services. Professor Larson states:

"While 'attendance' in the nursing sense is covered, as the cases just discussed indicated, a line has been drawn between nursing attendance and services that are in essence housekeeping. Rhode Island provides for 'such reasonable ... attendance ... as is necessary in order to cure, rehabilitate or relieve the employee from the effects of his injury.' Claimant, whose loss of use of both hands made it impossible to do many ordinary household chores, was held by the Rhode Island court not entitled to be provided with the assistance of a worker in the home whose duties would admittedly be those of 'a combination housekeeper and personal maid.' The court said that the term 'relieve' must, in view of the heading and context of the section, be construed to refer only to relief that is medical in character. The evidence showed that the services contemplated were not such as would be required of either a registered or practical nurse." 2 A. Larson, Workmen's Compensation §61.13(d)(4), at 10—892 (1989).

Emily testified that she assists the claimant with his bathing routine by placing the bench he sits on in the bath tub and positioning his wheelchair so he can get into the bath tub. She gets the board ready for him to transfer into the tub and helps him with the transfer. She starts the water for him and adjusts the shower curtain. She helps him wash his legs because he cannot reach that far without falling over. She performs these tasks once or twice a week. Emily does the laun-

dry, puts the dishes and Chris' laundry away, and does the cooking. She also puts down the portable ramps so that claimant has access to enter and leave the residence. Although claimant is able to dress himself, she will help him with his socks and shoes when his feet and ankles are swollen. While Emily continues to hold the same job and works the same hours that she did prior to claimant's injury, she testified that when claimant was alone, she called every 10 to 15 minutes to check on him and made visits home during the day.

Thus, in order to determine whether claimant is entitled to compensation for Emily's services, we must determine the nature of the services she rendered. We find the cases of *Currier* and *DeLong v. 3015 West Corp.* (Fla. App. 1986), 491 So. 2d 1306, to be instructive as they both involve nonfamily members rendering a combination of nursing and housekeeping services as in the case before us.

In *Currier*, Currier was totally disabled due to a fall. Upon his return home from the hospital, he employed a dietary assistant he had met during his hospital stay as a "domestic household service worker and personal nurse" at a salary of $800 per month, plus room and board. (*Currier*, 228 Neb. at 40, 421 N.W. 2d at 27.) According to the testimony at trial, the dietary assistant made Currier's coffee in the morning, bathed or showered him, put on his shoes and socks, helped him dress, made his breakfast, did his housework and yard work, took him to the doctor, assisted him when he experienced muscle spasms, and helped him off the bathroom stool. In addition to these duties, she continued to work 27 to 32 hours per week as a dietary assistant at the hospital.

In upholding the award for the services of the dietary assistant, the court stated:

> "We note that this court is in accord with other jurisdictions which deny compensation for ordinary household duties which are performed by a spouse. The basis for such holdings is that a spouse performs such duties both for herself and for her husband as a part of the marital relationship. Such considerations are not present in this case.
>
> \* \* \*
>
> Ordinary, noncompensable housekeeping tasks include cleaning, preparation of meals, and washing and mending clothes. Compensable tasks include serving meals in bed, bathing and dressing, administering medication and assisting with sanitary functions. [Citations.]

The testimony presented at the 1986 rehearing established that Currier is unable to live in his own home without assist-

ance. Currier needs help in dressing, bathing, relief of pain during a muscle spasm, administering of medication, and in the event of a fall. The testimony fully supports the finding of the compensation court that the services provided by the dietary assistant are medically necessary and thus compensable, because those specific services are beyond the scope of ordinary household duties." *Currier*, 228 Neb. at 441-45, 421 N.W.2d at 29-30.

Similarly, in *DeLong*, the court distinguished between a spouse performing household services and a nonfamily member performing those same services. In that case DeLong, prior to his injury, had performed all of the housekeeping chores due to his wife's epileptic condition which had rendered her incapable of doing any type of housework. After he was injured, DeLong's orthopedic surgeon recommended complete bed rest and that he perform no household chores. DeLong hired his son's girlfriend, Ms. Wagner, to do the household chores which included cooking, cleaning, washing clothes, shopping, lawn work, driving DeLong and his wife to their doctor appointments, and assisting DeLong with his motion exercises. Ms. Wagner was to be compensated at the rate of $100 per week plus room and board. DeLong's claim for compensation for attendant care was denied, and he appealed. Reversing the denial, the court stated:

> "The general rule is that shopping, cooking and other household services performed by the spouse or other family member are considered gratuitous and cannot form the basis for an award of attendant care services. [Citations.] The attendant care in the instant case, however, was provided by [DeLong's] son's girlfriend, not by a family member. Moreover, this case is similar to [citation], in which the claimant was held to be entitled to compensation for attendant care provided by her mother and a friend, even though the services involved ordinary household chores, where the claimant ordinarily lived alone and the mother and friend substantially departed from their usual daily routine to care for claimant. In this case, Ms. Wagner moved to Florida from New York in order to care for [DeLong]." *DeLong*, 491 So. 2d at 1307.

■ Dr. Szymke testified, without contradiction, that claimant could not live in his house without assistance provided either by a home care service or a "significant other." Many of the tasks that Emily performed were necessitated by claimant's injury and, therefore, we do not consider them to be ordinary household duties. (See *Currier*, 228 Neb. at 38, 421 N.W.2d 25.) Moreover, Emily, although engaged to the claimant, is not his spouse and, therefore, compensa-

tion for her performance of housekeeping services is not automatically barred.

The decision of the Commission on August 1, 1987, found, among other things, that the claimant required either home modifications or 24-hour-per-day care which Emily was not obligated to provide; this evidence was unrebutted, and based on this, the Commission awarded the sum of $21,924 for the services provided to the claimant by Emily.

■ Thereafter, the circuit court on review set aside the decision of the Commission awarding the sum of $21,924 for Emily's services on the basis that the findings of the Commission were against the manifest weight of the evidence, even though the evidence that claimant required 24-hour-per-day care was unrebutted in the record. On the basis of the record, it is clear that the order of the circuit court dated February 11, 1988, was not supported by the record, and, accordingly, the circuit court improperly found that the award for Emily's services was against the manifest weight of the evidence. The Commission's award to the claimant for Emily's services is supported by the evidence.

Having found that the evidence in the record supports the award of $21,924 for the services of Emily, and that the award is not against the manifest weight of the evidence, we therefore conclude' that the September 2, 1987, decision of the Commission denying payment for Emily's services in accordance with the remanding order of the circuit court is not supported by the record, and the record supports the awarding of $21,924 to the claimant for Emily's services.

Finally, the claimant contends that the September 2, 1988, order of the Commission denying attorney fees for the failure of the employer to pay medical expenses, the bill for the Quality Care Service and for the maintenance care rendered by Emily was against the manifest weight of the evidence.

Section 16 of the Act provides as follows:

"Whenever the Commission shall find that the employer, *** or insurance carrier has been guilty of delay or unfairness *** in the adjustment, settlement or payment of benefits due such employee ***, or has been guilty of unreasonable or vexatious delay, intentional under-payment of compensation benefits, or has engaged in frivolous defenses which do not present a real controversy, within the purview of the provisions of paragraph (k) of Section 19 of this Act, the Commission may assess all or any part of the attorney's fees and costs against such employer and his or her insurance carrier." (Ill. Rev. Stat. 1987, ch. 48, par. 138.16.)

Section 19(k) provides in pertinent part:

> "In case where there has been any unreasonable or vexatious delay of payment ***, then the Commission may award compensation additional to that otherwise payable under this Act equal to 50% of the amount payable at the time of such award. Failure to pay compensation in accordance with the provisions of Section 8, paragraph (b) of this Act, shall be considered unreasonable delay." Ill. Rev. Stat. 1987, ch. 48, par. 138.19(k).

In *Childress v. Industrial Comm'n* (1982), 93 Ill. 2d 144, the arbitrator awarded $78.79 in attorney fees to claimant pursuant to section 16 of the Act as a penalty for the unreasonable and vexatious delay by the employer in the payment of medical expenses. On review, the Commission increased the award of attorney fees to $950.

On review by the supreme court, the court held that an award of attorney fees for unreasonable and vexatious delay in the payment of medical expenses was not proper under section 16 of the Act. The court explained:

> "Furthermore, paragraph (k) of section 19 defines 'unreasonable delay' as referring to compensation as awarded under section 8(b) of the Act [citation]. Section 8(b) of the Act pertains solely to the payment of compensation for lost wages. This is clearly different from the payment by the employer for all necessary medical and surgical services as delineated by section 8(a) of the Act [citation]. Section 8(a) also provides that '[t]he furnishing of any such services *** by the employer is *not* the payment of compensation.' " (Emphasis in original.) 93 Ill. 2d at 149.

Although acknowledging that *Childress* might be correct when seeking section 16 penalties within the purview of the provision of section 19(k) of the Act, claimant argues that *Childress* does not address whether penalties may be assessed for failure to pay necessary maintenance expenses, nor does it address "unfairness towards an employee within the purview of the provision of paragraph (c) of Section 4 of the Act."

■ In his brief, claimant has quoted only a portion of section 4(c) of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.4(c)). Section 4(c) deals with actions by the Commission against insolvent employers or insurers, and although it does address actions against self-insured employers or insurance companies where they are practicing a policy of unfairness towards employees, this section does not permit the assessment of attorney fees as a penalty for such conduct.

■ With regard to "maintenance expense," claimant ignores the

language in *Childress* wherein the court stated:

> "It is possible for attorney fees to be assessed against an employer for refusal to pay the injured employee's expenses under 8(a) of the Act, but the proper statutory provision under which such fees are awarded is section 19(g) [citation]. \*\*\* Section 19(g) applies to the employer's refusal to pay after a final award rather than mere delay in payment as in section 19(k)." (*Childress*, 93 Ill. 2d at 150-51.)

It is clear that claimant may not recover attorney fees for delay in payment of maintenance expenses as opposed to a refusal to pay following a final award.

Finally, claimant argues that it is the "ultimate unfairness" to him that he is forced to pay an attorney to procure medical benefits which his doctors have stated he is in need of and which are related to his accident. Claimant notes that section 16a(D) (Ill. Rev. Stat. 1987, ch. 48, 138.16a(D)) provides, "No attorneys' fees shall be charged with respect to compensation for undisputed medical expenses." He then surmises that the reverse must be true that attorney fees can be charged for disputed medical expenses.

■ Claimant misses the· point of section 16a(D). Section 16a(A) provides as follows:

> "In the establishment or approval of attorney's fees in relation to claims brought under this Act, the Commission shall be guided by the provisions of this Section and by the legislative intent, hereby declared, to encourage settlement and prompt administrative handling of such claims and *thereby reduce expenses to claimants for compensation under this act.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 48, par. 138.16a(A).)

Section 16a(D) bars the award of attorney fees to a claimant's attorney when there is no dispute as to the medical bills to be paid. In other words, a claimant's attorney does not get paid where no dispute exists. Section 16a(D) does not therefore support his contention that attorney fees should be awarded against his employer.

We granted the employer's motion to cite additional authority of *E.L. Kaplan Co. v. Industrial Comm'n* (1990), 195 Ill. App. 3d 640. Relying on *Kaplan*, the employer for the first time makes the argument that claimant was not entitled to a section 19(b—1) hearing (an expedited hearing) (Ill. Rev. Stat. 1987, ch. 48, par. 138.19(b—1)) because claimant was receiving compensation under section 8(b) of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.8(b)).

■ Ordinarily, an issue not presented to the trial court cannot be raised for the first time on appeal; however, a corollary to this rule

permits an appellee to defend a judgment or review by raising an issue not previously ruled upon by the trial court if the necessary factual basis for the determination of such point is contained in the record, and the points on appeal are commensurate with the issues presented to the trial court. *Coleman v. Hinsdale Emergency Medical Corp.* (1982), 108 Ill. App. 3d 525, 527.

In the case before us, the employer never argued at any stage of the proceedings against the expedited hearing under section 19(b—1) and, in fact, participated in those proceedings. The *Kaplan* decision was rendered prior to oral argument in this case but was still not argued by the employer at that time. At this stage of the proceedings, whether claimant was entitled to an expedited hearing bears no relationship to the issue which we have resolved in claimant's favor. Finally, the statute which compelled the decision in *Kaplan* was in existence prior to the time claimant in this case requested a section 19(b—1) hearing.

While litigants are bound by rules of waiver, the courts are not similarly barred when it may be proper to override them to achieve a just result or maintain a uniform body of precedent in cases of public importance. (*Diversified Computer Services, Inc. v. Town of York* (1982), 104 Ill. App. 3d 852, 855.) We are of the opinion that courts are similarly not bound by the corollary to the rule of waiver under the same circumstances. In the interest of a just result in this case, we will not permit the employer to interject a new theory upon which to deny claimant benefits for maintenance expenses where that theory was available to the employer throughout the course of these proceedings and where its introduction into the case at the final stages of the proceedings would serve to greatly prejudice the claimant.

The decision of the circuit court affirming the Commission's denial of the award of compensation for the services of Emily Purtscher is reversed and that award is reinstated. The remainder of the decision of the circuit court is affirmed.

*Reversed in part; affirmed in part and award reinstated.*

McNAMARA, McCULLOUGH, and LEWIS, JJ., concur.

PRESIDING JUSTICE BARRY, concurring in part and dissenting in part:

While I generally concur with the majority's decision, I disagree with its specific finding that section 16 penalties may not be awarded for an unreasonable and vexatious delay in the payment of medical and

maintenance expenses. The majority rests its position that such penalties may not be awarded on *Childress v. Industrial Comm'n* (1982), 93 Ill. 2d 144, 442 N.E.2d 841. I believe, however, that Justice Simon in his dissent in *Childress* does a better job of applying the rules of statutory construction than does the *Childress* majority. For the reasons stated by Justice Simon, I find that the phrase "unreasonable or vexatious delay" in section 16 includes a delay in the payment of medical and maintenance expenses. Accordingly, I would reinstate the Commission's initial decision awarding the claimant attorney fees.

Quoting from *Childress*, the majority here attempts to support its position by noting that section 19(g) provides for an award of attorney fees when an employer refuses to pay an injured worker's section 8(a) expenses after a final award. In my view, section 19(g) does not prevent attorney fees from being awarded for a delay in the payment of medical and maintenance expenses at an earlier stage, any more than it prevents a similar award for a delay in disability benefits. Section 19(g) merely provides an additional means of gaining attorney fees.

Also quoting from *Childress*, the majority states that the furnishing of "any such services" is not the payment of compensation. In so doing, the court implies that "such services" refers to all section 8(a) medical expenses. The *Childress* majority and the majority here, however, have taken the quoted language out of context, since it refers only to the employer's furnishing of artificial limbs, eyes, and teeth.

In reaching its decision, the *Childress* court relied heavily on *Colclasure v. Industrial Comm'n* (1958), 14 Ill. 2d 455, 153 N.E.2d 33. However, *Colclasure* is distinguishable. It held only that medical expenses were not "compensation" for the purposes of a provision which extinguished the right to "compensation" on an employee's death. It also noted that medical expenses affect the entire family and, to further the purposes of the Act, should be payable after an employee's death.

Here, the insurance company discontinued the Quality Care assistance even though it appears to have been absolutely necessary for the claimant as of the date of the arbitrator's initial hearing. This left the paraplegic claimant with only a rental wheelchair, some unidentified bathroom equipment, and a portable ramp. Just as the statute does not intend that an employer should be allowed to litigate vexatiously to delay the payment of disability benefits, I do not believe that it should be read so as to permit an employer to vexatiously delay the payment of necessary medical and maintenance expenses, forcing the employee to sue for those expenses at his own cost. Denying an employee attorney fees in such a case is repugnant to the Act's goals. See Ill. Rev.

Stat. 1987, ch. 48, par. 138.16a(A). Accordingly, I would confirm the August 1, 1987, decision of the Commission in its entirety.

Further, I urge the legislature to clarify whether medical and maintenance care should be considered "compensation" so that penalties may be imposed in cases such as this.